Melanie B. CAHILL

v.

Margaret P. MORROW, Individually and in her capacity as Executrix of the Estate of George R. Morrow.

No. 2008–34–Appeal.

Supreme Court of Rhode Island.

Jan. 20, 2011.

James H. Reilly, Esq., for Plaintiff.

Lauren E. Jones, Esq., for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

The defendant, Margaret P. Morrow (defendant or Morrow), appeals from a Washington County Superior Court judgment declaring that Melanie B. Cahill (plaintiff or Cahill) perfected title to the defendant's property by adverse possession. She challenges the trial justice's decision on two grounds. First, that he failed to give sufficient weight to the plaintiff's offers to purchase the property, thus indicating that her claim never was adverse to the defendant's ownership interest. Second, that the trial justice erred when he found that the plaintiff's evidence met the standard of clear and convincing proof required for such claims. After careful review of the record and the briefs and hearing the parties' oral arguments, this Court vacates the judgment of the Superior Court and remands the papers in this case for further proceedings consistent with this opinion.

## I

### Facts and Procedural History [1]

The property in dispute is located on Gooseberry Road in the Snug Harbor section of South Kingstown, Rhode Island. Identified as lot 19 on assessor's plat 88–1,

1. This matter was heard as a bench trial in the Washington County Superior Court on February 23, 26, 27, 2007 and May 31, 2007.

the land is sandwiched between lot 20, currently owned by Cahill, and lot 18, formerly co–owned by members of the Morrow family. Morrow is the record owner of the subject property, lot 19.

In 1969, Morrow's husband, George Morrow, purchased lot 19,[2] and the same year George and his brothers jointly purchased lot 18. At the time of lot 19's purchase, it was largely undeveloped, marked only by a preexisting clothesline, grass, and trees. Since that time, the Morrows have not improved or maintained lot 19, but have paid all property taxes assessed to it. As such, instead of vacationing on their lot 19, the Morrows annually spent two weeks in the summer at the cottages on the adjacent lot 18. During these vacations, the Morrow children and their cousins played on lot 19's grassy area. Around 1985, the Morrows ceased summering on Gooseberry Road,[3] but continued to return at least once a year to view the lot. Morrow stopped visiting lot 19 in October 2002, after her husband became ill, and she did not return again until July 2006.

In 1971, two years after George Morrow purchased lot 19, Cahill's mother bought the land and house designated as lot 20 as a summer residence. Between 1971 and 1975, Cahill and her brother did some work on lot 19. They occasionally cut the grass, placed furniture, and planted trees and flowers on it.

Cahill's mother passed away in 1975, and in 1977, after purchasing her siblings' shares, Cahill became the sole record owner of the lot 20 property. Once she became lot 20's owner, Cahill began living in the house year-round. From that time through 1991, she and her boyfriend, James M. Cronin, testified that they continued to mow lot 19's grass on occasion. In addition, she hung clothing on the clothesline, attached flags to the clothesline pole, used the picnic table,[4] positioned a bird bath and feeder, and planted more flowers and trees. Cahill placed Adirondack chairs on lot 19 and eventually replaced the clothesline and picnic table. In 1987, Cahill held the first annual "cousins' party" allowing her relatives free rein with respect to her property and lot 19 for playing, sitting, and car parking. She also entertained friends and family on lot 19 during other summer days. Mary Frances McGinn, Cahill's cousin, likewise recalled that lot 19 was occupied by Cahill kindred during various family functions throughout this time period. Cahill admitted that she never objected to neighborhood children using lot 19, however.

During the period of 1991 through 1997, Cahill testified that she planted more flowers and trees, in addition to cutting the grass occasionally. Cahill also stored her gas grill and yard furniture on the lot and had her brother stack lobster pots for decorative purposes. In 1991 or 1992, she began hosting the annual "Cane Berry Blossom Festival," another outdoor event that used both her lot and lot 19 as the party venue. Like the other gatherings, the festival always took place on a day during a warm-weather month. In 1997 or 1998, she installed a wooden border around the flower beds.

On July 22, 1997, Cahill wrote to George Morrow expressing an interest in obtain-

2. Morrow became the successor in interest and legal title holder of lot 19 after George passed away in 2003.

3. In 1991, George Morrow and his joint-owner brothers sold lot 18.

4. The record was unclear as to who first placed a picnic table on lot 19, but Cahill testified that there was a table on the lot from at least 1981.

ing title to lot 19. In the 1997 letter, Cahill stated: "I am interested in learning if your narrow strip of property is available for sale. If so, I would be interested in discussing purchasing it from you." Cahill continued: "If there is a possibility that you would like to sell it, could you please either call me or send me a note?" Cahill did not receive a response.

In the "late 1990s," though Cahill is unclear whether this occurred before or after the 1997 letter, a nearby marina sought permission to construct and elevate its property. Cahill attended the related zoning board hearings and expressed her concerns about increased flooding on lot 19 due to the marina elevation. She succeeded in having the marina developer grade part of lot 19 to alleviate flooding. Additionally, Cahill instituted her own trench and culvert drainage measures to divert water off of lot 19 and then reseeded the graded area. By Cahill's own admission, however, her trenching and reseeding work occurred in 1999 or 2000.

Subsequent to 2001, the new owners of lot 18[5] stored their boat on lot 19 and planted their own flowers and small trees on the property. In 2002, when the town (with approval from George Morrow) erected a stone wall and laid a sidewalk on the Gooseberry Road border of lot 19, Cahill loamed and planted grass on that portion of the lot. Also in 2002, Cahill asked Morrow's two sisters on separate occasions whether George Morrow would be interested in selling lot 19. The Mor-

rows gave no response to her 2002 inquiries. In 2003, George Morrow passed away.

After making her third inquiry concerning the purchase of lot 19 in 2002, Cahill testified, she continued using the property in a fashion similar to her prior practice until December 2005, when she noticed heavy-machinery tire marks and test pits on the land. Thereafter, she retained counsel and authorized her attorney to send a letter on January 10, 2006 to Morrow indicating her adverse possession claim to a "20–foot strip of land on the northerly boundary" of lot 19.[6] According to a survey of the disputed property, however, the width of lot 19 from the northerly boundary (adjacent to Cahill's property) to lot 18 is 49.97 feet and therefore, more than double what Cahill originally claimed in this letter. Nonetheless, on April 25, 2006, Cahill instituted a civil action requesting a declaration that based on her "uninterrupted, quiet, peaceful and actual seisin and possession" "for a period greater than 10 years," she was the true owner of lot 19 in its entirety. On July 25, 2007, the trial justice agreed that Cahill had proved adverse possession under G.L.1956 § 34–7–1 and vested in her the fee simple title to lot 19.

Judgment was entered for Cahill on August 1, 2007. Morrow filed a timely notice of appeal on August 17, 2007, primarily contending that the trial justice did not weigh appropriately Cahill's 1997 offer-to-purchase letter and also that the evidence

---

**5.** In approximately 2001, new owners purchased lot 18 from the Morrow brothers' successor.

**6.** Before resting her case, Morrow sought to introduce portions of Cahill's September 14, 2006 deposition to rebut Cahill's trial testimony. Cahill objected to the piecemeal introduction of evidence to Morrow's case-in-chief and instead requested that the trial justice

admit the entire deposition based on Rule 32(a)(4) of the Superior Court Rules of Civil Procedure. The trial justice agreed with Cahill, and the entire deposition was entered as plaintiff's full exhibit. Although the letter of January 10, 2006 from Cahill's attorney to Morrow was not presented at trial, Cahill did testify at her deposition to the existence and content of this letter.

presented did not establish adverse possession by clear and convincing proof. On December 18, 2009, this Court, sitting as a bench of four justices, was evenly divided and thus affirmed the Superior Court's judgment. *Cahill v. Morrow*, 985 A.2d 1016, 1017 (R.I.2009) (mem.). Morrow moved pursuant to Article I, Rule 25(a) of the Supreme Court Rules of Appellate Procedure to reargue her appeal once this Court was joined by a fifth member. Her request was granted on January 15, 2010 and on September 29, 2010, this Court again heard oral argument. As such, we now decide Morrow's appeal upon its merits.

## II

### Standard of Review

"This Court gives great weight to the factual findings of a trial justice sitting without a jury in a civil matter, and we will not disturb such findings unless they are 'clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.' " *Costa v. Silva*, 996 A.2d 607, 611 (R.I.2010) (quoting *Harris v. Town of Lincoln*, 668 A.2d 321, 326 (R.I.1995)). If the trial justice's decision "reasonably indicates that [he] exercised [his] independent judgment in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or otherwise incorrect as a matter of law." *Now Courier, LLC v. Better Carrier Corp.*, 965 A.2d 429, 434 (R.I.2009) (quoting *Notarantonio v. Notarantonio*, 941 A.2d 138, 144–45 (R.I.2008)). Furthermore, it is permissible for the trial justice to "draw inferences from the testimony of witnesses, and such inferences, if reasonable, are entitled on review to the same weight as other factual determinations." *DeSimone Electric, Inc.*

*v. CMG, Inc.*, 901 A.2d 613, 621 (R.I.2006) (quoting *Walton v. Baird*, 433 A.2d 963, 964 (R.I.1981)). "However, '[i]n contrast to our deferential stance vis-[à]-vis factual findings made by a trial justice, we review in a *de novo* manner a trial justice's rulings concerning questions of law.'" *Costa*, 996 A.2d at 611 (quoting *Grady v. Narragansett Electric Co.*, 962 A.2d 34, 41 (R.I. 2009)).

## III

### Analysis

### A

### The History and Policy Rationale of Adverse Possession

Before we begin our analysis, a brief history of adverse possession may be of assistance. After first using an amalgamation of Roman and Germanic doctrine, our English predecessors in common law later settled upon statutes of limitation to effect adverse possession. *See* Axel Teisen, *Contributions of the Comparative Law Bureau*, 3 A.B.A. J. 97, 126, 127, 134 (1917). In practice, the statutes eliminated a rightful owner's ability to regain possession after the passing of a certain number of years, thereby vesting de facto title in the adverse possessor. *See* Restatement (Third) *Property: Servitudes* § 2.17, cmt. *b* at 263–64 (2000). For example, a 1623 statute of King James I restricted the right of entry to recover possession of land to a period of twenty years. 10 *Thompson on Real Property* § 87.01 at 74–75 (2d Thomas ed. 1998) (citing An Act for Limitation of Actions, and Avoiding of Suit in Law, 1623, 21 Jac. I., c. 16). Essentially, in England, the "[o]riginal policy supporting the development of adverse possession reflected society's unwillingness to take away a 'right' which an adverse possessor thought he had. Similarly, society felt the loss of an unknown right by the title owner

was minimal." William G. Ackerman & Shane T. Johnson, Comment, *Outlaws of the Past: A Western Perspective on Prescription and Adverse Possession*, 31 Land & Water L.Rev. 79, 83 (1996). As an overarching principle, however, the English adhered to an irrefutable truth that "neither fraud nor might can make a title where there wanteth right." *J & M Land Co. v. First Union National Bank*, 166 N.J. 493, 766 A.2d 1110, 1114 (2001) (quoting *Altham's Case*, 8 Coke Rep. 150b, 153b, 77 Eng. Rep. 701, 707 (1610)).

In the United States, although the 1623 statute of King James I "came some years after the settling of Jamestown (the usual date fixed as the crystalizing of the common law in America), its fiat is generally accepted as [our] common law. Hence 'adverse possession' for 20 years under the common law in this country passes title to the adverse possessor with certain stated qualifications." 10 *Thompson on Real Property* § 87.01 at 75. Today, all fifty states have some statutory form of adverse possession, typically requiring proof that "possession was actual, hostile, open and notorious, exclusive, and continuous for the period of the statute of limitations. Color of title and payment of taxes can also be elements in some cases." Jeffrey Evans Stake, *The Uneasy Case for Adverse Possession*, 89 Geo. L.J. 2419, 2423 (2001); *see* Ackerman, 31 Land & Water L.Rev. at 84 n. 42, 111 (collecting adverse possession statutes for the fifty states).

Given the doctrine's widespread codification in this country, adverse possession is certainly "part of our adoptive consciousness." Ackerman, 31 Land & Water L.Rev. at 84. Courts and commentators generally ascribe to "four traditional justifications or clusters of justifications which support transferring the entitlement to the [adverse possessor] after the statute of limitations runs: the problem of lost evidence,

the desirability of quieting titles, the interest in discouraging sleeping owners, and the reliance interests of [adverse possessors] and interested third persons." Thomas W. Merrill, *Property Rules, Liability Rules, and Adverse Possession*, 79 Nw. U.L.Rev. 1122, 1133 (1984); *see also Finley v. Yuba County Water District*, 99 Cal.App.3d 691, 160 Cal.Rptr. 423, 427 (1979) (summarizing the rationales supporting adverse possession). Effectively, our society has made a policy determination that "all things should be used according to their nature and purpose" and when an individual uses and preserves property "for a certain length of time, [he] has done a work beneficial to the community." Teisen, 3 A.B.A. J. at 127. For his efforts, "his reward is the conferring upon him of the title to the thing used." *Id.* Esteemed jurist Oliver Wendell Holmes, Jr. went a step further than Teisen, basing our society's tolerance of adverse possession on the ideal that "[a] thing which you have enjoyed and used as your own for a long time, whether property or an opinion, takes root in your being and cannot be torn away without your resenting the act and trying to defend yourself, however you came by it." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1016 (10th Cir.2004) (quoting Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L.Rev. 457, 477 (1897)).

Regardless of how deeply the doctrine is engrained in our history, however, courts have questioned "whether the concept of adverse possession is as viable as it once was, or whether the concept always squares with modern ideals in a sophisticated, congested, peaceful society." *Finley*, 160 Cal.Rptr. at 427. Commentators have also opined that, along with the articulated benefits of adverse possession, numerous disadvantages exist including the "infringement of a landowner's rights, a decrease in value of the servient estate,

and the encouraged exploitation and development of land. In addition, they represent the generation of animosity between neighbors, a source of damages to land or loss of land ownership, and the creation of uncertainty for the landowner." Ackerman, 31 Land & Water L.Rev. at 92; *see also* Stake, 89 Geo. L.J. at 2432, 2433 (listing also "diminish[ing] utility by discouraging owners from letting others use their land," wasting the rightful owner's time and resources to monitor his land, and "creat[ing] an opportunity to steal land" as other costs associated with adverse possession). In reality, "[a]dverse possession '[i]s nothing more than a person taking someone else's private property for his own private use.' It is hard to imagine a notion more in contravention of the ideals set forth in the U.S. Constitution protecting life, liberty and *property*." Ackerman, 31 Land & Water L.Rev. at 94–95 (quoting 2 C.J.S. *Adverse Possession* § 2 (1972)).

Although this Court duly recognizes its role as the judicial arm of government tasked with applying the law, rather than making law, it is not without an eyebrow raised at the ancient roots and arcane rationale of adverse possession that we apply the doctrine to this modern property dispute.

### B

### The Trial Justice's Application of Rhode Island's Adverse–Possession Precedent

In Rhode Island, obtaining title by adverse possession requires actual, open, notorious, hostile, continuous, and exclusive use of property under a claim of right for at least a period of ten years. *Corrigan v. Nanian,* 950 A.2d 1179, 1179 (R.I.2008) (mem.); *see also* § 34–7–1. "The party who asserts that adverse possession has occurred must establish the required elements by strict proof, that is, proof by clear and convincing evidence." [7] *Corrigan,* 950 A.2d at 1179 (citing *Tavares v. Beck,* 814 A.2d 346, 350 (R.I.2003)); *see also Carnevale v. Dupee,* 853 A.2d 1197, 1199 (R.I.2004).

Here, the trial justice recited the proper standard of proof for adverse possession and then found that Cahill had

"met her burden of establishing all of the elements of an adverse possession claim to lot 19 by her and her mother's continuous and uninterrupted use of the parcel for well in excess of ten years. She maintained the property, planted and improved the property with shrubs, trees, and other plantings, sought drainage control measures, and used the property as if it were her own since 1971. She established that use not only by her own testimony, but as corroborated by other witnesses, photographs, and expert testimony relative to the interpretation of aerial photographs."

At trial, as here on appeal, Morrow argued that Cahill's offers to purchase the property invalidated her claim of right and the element of hostile possession. To dispose of that issue, the trial justice determined that "even assuming that [Cahill's] inquiry is circumstantial evidence of her knowledge that George Morrow, and sub-

---

7. "Clear and convincing evidence is defined in a variety of ways; for example, to establish a fact or an element by clear and convincing evidence a party must persuade the jury that the proposition is highly probable, or must produce in the mind of the factfinder a firm belief or conviction that the allegations in question are true. The clear and convincing evidence standard does not require that the evidence negate all reasonable doubt or that the evidence must be uncontroverted." 29 Am.Jur.2d *Evidence* § 173 at 188–89 (2008).

sequently Margaret [Morrow], were the legal title holders of [lot] 19, that does not destroy the viability of this adverse possession claim." The trial justice relied upon our opinion in *Tavares*, 814 A.2d at 350, to support his conclusion. Recalling that this Court stated in *Tavares* that "even when the claimants know they are nothing more than black-hearted trespassers, they can still adversely possess the property in question under a claim [of] right to do so if they use it openly, notoriously, and in a manner that is adverse to the true owner's rights for the requisite ten-year period," the trial justice found that Cahill's outward acknowledgement of Morrow's record title did not alone "negate her claim of right." He further found that "even if somehow the expression of interest in purchasing lot 19, made initially in 1997, stopped the running of the ten[-]year period under * * * § 34–7–1, the evidence was overwhelming that [Cahill] and her predecessor in title had commenced the requisite ten-year period beginning in 1971."

## C

### Issues on Appeal

On appeal, Morrow challenges the trial justice's legal conclusion that Cahill's offers to purchase lot 19 did not extinguish her claim of right, hostile possession, and ultimately, the vesting of her title by adverse possession. Morrow also contends that the trial justice erred in finding that Cahill's testimonial and demonstrative evidence was sufficient to prove adverse possession under the clear and convincing burden of proof standard. We agree that as a matter of law the trial justice failed to consider the impact of Cahill's offers to purchase on the prior twenty-six years of her lot 19 use. As a result, we hold that this failure also affects his factual determinations.

### 1

### 1997 Offer–to–Purchase Letter

 In *Tavares*, this Court explained that "requir[ing] adverse possession under a claim of right is the same as requiring hostility, in that both terms simply indicate that the claimant is holding the property with an intent that is adverse to the interests of the true owner." *Tavares*, 814 A.2d at 351 (quoting 16 *Powell on Real Property*, § 91.05[1] at 91–28 (2000)). "Thus, [we said] a claim of right may be proven through evidence of open, visible acts or declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the record owner." *Id.* (citing *Picerne v. Sylvestre*, 122 R.I. 85, 91–92, 404 A.2d 476, 479–80 (1979)). Here, the first issue on appeal is how an offer to purchase has an impact on these elements.

To assert her position that Cahill's 1997 offer to purchase lot 19 negates Cahill's claim of right by failing to deny the owner's title, Morrow argues that this Court should adhere to our precedent in *Picerne* and decline to credit the "dicta" in *Tavares* that the trial justice relied upon. Opportunely, however, the instant case permits this Court to affirm both precedents while clarifying a salient point of law regarding the effect offers to purchase have on the adverse possession elements of hostility and claim of right.

In *Picerne*, 122 R.I. at 91–92, 404 A.2d at 479–80, we focused on the narrow issue of whether a taxpayer who lost a home in a tax sale could prove hostile use for purposes of adverse possession. This Court considered whether the taxpayer's affirmative and open acts, such as painting the exterior, installing a new door and windows, and replacing the front stairs put the tax-sale purchaser on sufficient notice that there was a "hostile air." *Id.* at 92,

404 A.2d at 480. We explained that the "[h]ostility of possession necessary to establish adverse possession implies the denial of the owner's title; and possession, however open and long it may be, is not adverse without the denial of the owner's title." *Id.* This Court held that the individuals in possession of the house failed to deny the tax-sale owner's title for at least three years of the ten-year period because their possession was permissive. *Id.* We likewise ruled that the claim had failed because the taxpayer's adverse actions did not meet the requisite ten-year period. *Id.* Without the requisite ten years of denying the owner's title and ten years of possessing adversely to the owner's title, the *Picerne* claimants could not establish adverse possession.

Analogously here, Cahill did not deny Morrow's title when she sent her 1997 letter to George Morrow. Rather, she was outwardly declaring to the rightful owner himself the viability of his title and fully acknowledging her subservient interest to that owner's title. This manifestation from Cahill interrupted the accrual of her claim. *See Heggen v. Marentette,* 144 N.W.2d 218, 242 (N.D.1966) ("[T]he recognition of the owner's title by an adverse claimant interrupts the adverse possession."); *Smith v. Vermont Marble Co.,* 99 Vt. 384, 133 A. 355, 358 (1926) ("Nothing can more effectively interrupt the running of the [adverse possession] statute than an express acknowledgment of the true owner's title. * * * This recognition of another's title may be by acts, as well as words. So when one who was wrongfully [using another's land] * * * yields to the latter's demands * * * and offer[s] to buy the right, his adverse use is interrupted, and his claim of prescriptive right fails."); *see also Bowen v. Serksnas,* 121 Conn.App. 503, 997 A.2d 573, 579 (2010) ("[T]he possession of one who recognizes or admits title in another, either by declaration or

conduct, is not adverse to the title of such other. * * * Such an acknowledgment of the owner's title terminates the running of the statutory period, and any subsequent adverse use starts the clock anew.") (quoting *Allen v. Johnson,* 79 Conn.App. 740, 831 A.2d 282, 286 (2003)); 3 Am.Jur.2d *Adverse Possession* § 104 at 171–72 (2002) ("Although efforts to obtain deeds from other claimants to the property do not disprove the hostile character of a possession, efforts to buy the property from the record owner constitute an acknowledgment of the record owner's superior title, and thus disprove the adverse holding, because there has been no claim of right."). Accordingly, applying *Picerne* to the instant facts, we hold that Cahill failed to deny George Morrow's title by her 1997 letter, thereby halting her adverse-possession claim at that time. *See Picerne,* 122 R.I. at 92, 404 A.2d at 480.

Likewise, in *Tavares,* 814 A.2d at 351, with regard to "establishing hostility and possession under a claim of right," we explained that "the pertinent inquiry centers on the claimants' *objective manifestations* of adverse use rather than on the claimants' *knowledge* that they lacked colorable legal title." (Emphases added.) Essentially, *Tavares* turned on the difference between the adverse possession claimant's "knowledge" regarding the owner's title and his "objective manifestations" thereof. In that case, the adverse-possession claimant surveyed his land and discovered "that he did not hold title to the parcels in question." *Id.* at 350. After such enlightenment, however, the claimant objectively manifested his claim of ownership to the parcels by "posting no-trespass signs, constructing stone walls, improving drainage, and wood cutting." *Id.* at 352. This Court explained that simply having knowledge that he was not the title owner of the parcels was not enough to destroy

his claim of right given his objective, adverse manifestations otherwise. *Id.* at 351–52. In fact, we went so far as to state that "even when claimants know that they are nothing more than black-hearted trespassers, they can still adversely possess the property in question under a claim of right to do so if they use it openly, notoriously, and in a manner that is adverse to the true owner's rights for the requisite ten-year period." *Tavares,* 814 A.2d at 351. This statement is legally correct considering that adverse possession does not require the claimant to make "a good faith mistake that he or she had legal title to the land." 16 *Powell on Real Property* § 91.05[2] at 91–23; *see* 5 Restatement of the Law *Property: Servitudes* § 458, cmt. *d* at 2927 (1944) ("[I]t is not necessary in order that a use be adverse that it be made either in the belief or under a claim that it is legally justified."). However, to the extent that *Tavares's* reference to "black-hearted trespassers" suggests that this Court endorses an invade-and-conquer mentality in modern property law, we dutifully excise that sentiment from our jurisprudence.

In the case before this Court, Cahill went beyond mere knowledge that she was not the record owner by sending the offer-to-purchase letter. As distinguished from the *Tavares* claimant who did not communicate his survey findings with anyone, Cahill's letter objectively declared the superiority of George Morrow's title to the record owner himself. *See Tavares,* 814 A.2d at 352; *see also Eddy v. Clayton,* 44 So.2d 395, 397 (Miss.1950) ("Moreover, the request of appellant to purchase the land, which was later repeated, is a pointed answer to any contention of an adverse claim, since it was an acknowledgment of a superior title and claim of [the record owner]."); *Chambers v. Bessent,* 17 N.M. 487, 134 P. 237, 240 (1913) ("It may safely be assumed as a general proposition that, if a defendant in possession of disputed territory concede[s] that the true title is in another, and offer to purchase from him, then the continuity of adverse possession is broken.") (quoting *Headerick v. Fritts,* 93 Tenn. 270, 24 S.W. 11, 12 (1893)); *Shanks v. Collins,* 782 P.2d 1352, 1355 (Okla.1989) ("A recognition by an adverse possessor that legal title lies in another serves to break the essential element of continuity of possession.").

In the face of this precedent, Cahill contends that the trial justice accurately applied the law by finding that an offer to purchase does not automatically negate a claim of right in the property. While we agree that this proposition is correct with respect to offers made in an effort to make peace in an ongoing dispute, we disagree that this proposition applies in situations, as here, where no preexisting ownership dispute is evident. For example, the trial justice and Cahill both cited *Richterberg v. Wittich Memorial Church,* 222 F.Supp. 324, 328 (W.D.Okla.1963), to support their view that an offer to purchase should not defeat an otherwise valid claim of adverse possession. However, *Richterberg* dealt with an already disputed claim and offer to compromise. *Id.* (concluding that "[a]n offer of settlement or compromise made with reference to a pending suit is not admissible in evidence" and that "[b]argaining for an outstanding claim or title does not constitute a recognition of the superiority of such claim or title"). Here, there was no dispute ongoing when Cahill sent the 1997 letter. Her offer was not an olive branch meant to put an end to pending litigation with the Morrows. Rather, it was a clear declaration that Cahill "wanted title to the property" from the record owner. By doing so, she necessarily acknowledged that her interest in lot 19 was subservient to George Morrow's. Likewise, the trial justice's and Cahill's citations to *Manning v.*

*Gregoire*, 97 Or. 394, 191 P. 657, 658 (1920), are equally inapposite because again, unlike Cahill's letter, the adverse possessor's offer-to-purchase letter in *Manning* was an attempt "to buy his peace." *See also Sanderson v. McManus*, 252 S.W.2d 351, 356 (Mo.1952) ("The fact that defendants attempted to purchase a strip 3 feet wide from plaintiffs * * * might have been persuasive evidence against the claim of adverse possession in some circumstances, but is not conclusive here * * *. If this were an effort to settle and adjust the controversy * * * an issue of fact was presented."). Cahill also incorrectly proffers the holding of *Branch v. Hinson*, 183 So.2d 655, 659–60 (La.Ct.App. 1966), as supporting her position. In *Branch*, after a survey was conducted on the property, "a dispute arose between the adjoining owners as to precisely where the [property] line lay." *Id.* at 659. Although "on several occasions [the claimant] attempted to purchase the strip in controversy as a means of settling all doubt as to where the correct dividing line lay[,]" the court held that these "offers to purchase did not constitute recognition of [the record owner's] title * * *, but were merely attempts to compromise a disagreement without acknowledging or recognizing [the record owner's] title to the land in dis-

pute." *Id.* at 660. Again, Cahill's situation is distinguishable from the parties' plight in *Branch* because there was no preexisting, ongoing dispute between Cahill and Morrow when Cahill sent the letter. Based on this caselaw, Cahill's 1997 offer for purchase does, in fact, recognize the superior title of the record owner and arrests the accrual of her claim.[8]

The only case Cahill cites that marginally supports her stance on offers to purchase is a pre–1900, Nebraska decision, *Oldig v. Fisk*, 53 Neb. 156, 73 N.W. 661 (1897). During the statutory period for adverse possession, the predecessor of the *Oldig* claimant "obtained a tax deed to the land" and then attempted to augment his tax-sale interest by purchasing the true, patent deed from the previous owner. *Id.* at 662. Faced with "the question whether an attempt by one in the adverse possession of land, and before the statutory period has expired, to purchase from the true owner, operates to devest [*sic*] his possession of its adverse character[,]" the *Oldig* Court answered that such an offer did not affect the adverse nature of the claim even though there was no ongoing dispute. *Id.* The court held that there was "no room to distinguish in this behalf between litigation

8. Without specific explanation as to the applicability to the facts of this case, Cahill also cites several cases from the late 1800s and early 1900s for support. Again, we are of the opinion that each case is distinguishable from the instant matter because, unlike here, there was a dispute ongoing when the claimants inquired about purchasing the land in question. *See Montgomery & Mullen Lumber Co. v. Quimby*, 164 Cal. 250, 128 P. 402, 404 (1912) ("[T]he plaintiff merely offered to buy in the defendant's claim in order to clear its title, and that this was after its possession had continued for more than five years."); *Warren v. Bowdran*, 156 Mass. 280, 31 N.E. 300, 301–02 (1892) ("[That] he was willing to pay something for the land to avoid litigation * * * and he made an offer for the land, that

fact would not conclusively show that he had not [obtained] a title upon which he could stand in this action * * *."); *Greene v. Couse*, 127 N.Y. 386, 28 N.E. 15, 16 (1891) (Because the rightful owner brought an ejectment action against the claimant's predecessor who was "at liberty to fortify his title or purchase peace at any price and of whomsoever he chose" the claimant did not forfeit his adverse-possession claim though the prior contract for purchase was attempted.); *Clithero v. Fenner*, 122 Wis. 356, 99 N.W. 1027, 1029 (1904) ("Negotiations to purchase the strip from [the record owner], to settle the dispute, do not in themselves absolutely establish a relinquishment of the claim of the rights acquired by adverse possession.").

threatened by word of mouth and litigation threatened by the fact that the title is outstanding,—a constant menace from the very fact of its existence." *Id.* at 663. Although we acknowledge that this decision is viable law, we disagree with its holding and note that it was decided more than 100 years ago in a state where land was expansive and recording deeds lacked efficiency. Further supporting our opinion is *Oldig's* dissent, which concluded that based on the tax purchaser's "conduct in attempting to purchase the real estate from [the patent deed holder] that from that time forth he did not claim title to the real estate as against [the patent deed holder], nor hold possession nor occupy the same adversely to him." *Id.* at 664 (Ragan, J., dissenting).

As such, Cahill's cited authorities do not convince this Court that an offer to purchase does not destroy the elements of hostility and claim of right when there is no ongoing dispute or outstanding claim. Here, the 1997 letter was not an attempt to make peace with her neighbors as a way to avoid litigation. Rather, Cahill was openly and objectively manifesting direct evidence that George Morrow was the true owner of lot 19 and her interest in the property was subservient to his. This communication negates the requisite claim of right that the doctrine of adverse possession requires and interrupts the accrual of Cahill's claim. *See Heggen,* 144 N.W.2d at 242 ("[T]he recognition of the owner's title by an adverse claimant interrupts the adverse possession."); *see also Bowen,* 997 A.2d at 579 (" 'Such an acknowledgment of the owner's title terminates the running of the statutory period, and any subsequent adverse use starts the clock anew.' "). This Court holds as a matter of law that Cahill's 1997 letter to George Morrow was an unequivocal offer to purchase that halted her claim of adverse possession at that point.

Accordingly, the trial justice erred by considering any incidents of ownership exhibited by Cahill after the 1997 letter to George Morrow interrupted her claim. Because the "drainage control measures" were instituted in 1999 or 2000 (by Cahill's own admission), the trial justice should not have cited these acts as supporting Cahill's adverse-possession case. Likewise, if the trial justice's reference to Cahill's "maint[enance of] the property" or "improve[ment of] the property with * * * other plantings" implicitly considered her reloaming and reseeding after the town installed the retaining wall and sidewalk in 2002 or her reseeding after the drainage improvements in 1999 or 2000, this reliance also was in error.

2

### The Impact of Cahill's Offer to Purchase on her Pre–1997 Adverse–Possession Claim

 Furthermore, we also conclude that the trial justice should not have assumed that even if Cahill's "inquiry is circumstantial evidence of her knowledge that George Morrow, and subsequently [Morrow], were the legal title holders of [lot] 19, that does not destroy the viability of this adverse possession claim." We agree that an offer to purchase does not automatically invalidate a claim already vested by statute, but we nonetheless hold that the objective manifestations that another has superior title, made after the statutory period and not made to settle an ongoing dispute, are poignantly relevant to the ultimate determination of claim of right and hostile possession during the statutory period. *See Harp v. Christian,* 215 Ark. 833, 223 S.W.2d 778, 779 (1949) ("It is true that an offer to purchase will not divest a title that has already become vested in the adverse claimant, but such

testimony may be considered in determining the character of the possession during the statutory period."); *Okuna v. Nakahuna,* 60 Haw. 650, 594 P.2d 128, 132 n. 5 (1979) ("[A]ppellant's conduct subsequent to the expiration of the statutory period of limitations, while not enough to defeat title already acquired by adverse possession, is evidence to be considered in determining whether the prior possession of appellant was in fact hostile."); *see also First National Bank of Marshall v. Beavers,* 602 S.W.2d 327, 330 (Tex.Civ.App.1980) ("[W]here a possessor acknowledges another's superior title * * * after the limitation period has been completed, such acknowledgment does not automatically destroy the title thus obtained, but it is admissible in evidence as tending to show that possession was not in fact adverse.").

Cahill's 1997 offer-to-purchase letter and the two 2002 purchase inquiries (though occurring after a time period statutorily sufficient to convey title by adverse possession) still are relevant as to whether the twenty-six years of possession prior to 1997 were made under a claim of right. How the offer and inquiries affect the nature and character of Cahill's pre–1997 possession necessarily are questions for the fact-finder to evaluate and are not resolvable by this Court. *See Lowe v. Cox,* 210 Ark. 169, 194 S.W.2d 892, 896 (1946) (holding that "the weight to be given to such recognition [in an offer to purchase] would be a question for the jury, and the court could not declare as a matter of law that the mere fact that defendant had recognized the title of the [plaintiff] entitled plaintiff to a judgment for possession") (quoting *Shirey v. Whitlow,* 80 Ark. 444, 97 S.W. 444, 445 (1906)); *Gonthier v. Horne,* 576 A.2d 745, 748 (Me.1990) (stating that deed requests made after the statutory period "rationally could be considered indicative of the nature of [the claimant's] prior holding during the 20–year [statuto-

ry] period [that] * * * [t]he Superior Court acting as the trier of fact was free to determine, as clearly it did, that this evidence indicated that [the claimant] did not possess the parcel under a claim of right during the crucial 20–year period").

### 3

### Questions of Fact Remain

■ Despite the significant deference afforded to the trial justice's findings of fact, such findings are not unassailable. Here, we find clear error in the trial justice's conclusion that "even if somehow the expression of interest in purchasing [lot] 19, made initially in 1997, stopped the running of the ten[-]year period * * * the evidence was overwhelming that [Cahill] and her predecessor in title had commenced the requisite ten-year period beginning in 1971." Given our opinion that some of Cahill's lot 19 activities cannot be considered because of the time frame of their occurrence, we disagree that the trial record can be classified as presenting "overwhelming" evidence of adverse possession.

Specifically, this Court holds that the drainage improvements and lawn reseedings that occurred after the 1997 offer-to-purchase letter cannot be used as evidence of Cahill's adverse possession. Whether the evidence remaining in the record is sufficient to constitute clear and convincing proof that Cahill perfected her claim prior to 1997 remains a question of fact. On remand, the trial justice is directed to limit his consideration to pre–1997 events and make specific determinations whether Cahill's intermittent flower and tree planting, flag flying, clothesline replacing, lawn chair and beach-paraphernalia storing, and annual party hosting are adequate. Furthermore, given our ruling today, the trial court must evaluate the nature of Cahill's

and her predecessor's twenty-six-year acts of possession in the harsh light of the fact that Cahill openly manifested the existence of George Morrow's superior title on three occasions. Lastly, this Court instructs the trial court to determine the impact of Cahill's initial demand, made in the letter of January 10, 2006, from her counsel to Morrow, on the claim of right and hostility elements. Cahill's 2006 letter staked a claim only to "a 20–foot strip," less than half the area of lot 19, while the later-filed 2006 complaint declared Cahill's right to the entire parcel. How Cahill's change of heart colors the adverse nature of her possession is a question that must be addressed by the finder of fact.

## IV

### Conclusion

For the foregoing reasons, we vacate the judgment and remand this case to the Superior Court with instructions to reevaluate the record prior to the 1997 offer-to-purchase letter. On remand, the Superior Court shall permit the parties to supplement the existing record by offering any additional testimony or other evidence that may assist the fact-finder in resolving the issues presented. The Superior Court then shall issue an amended decision and judgment that is not inconsistent with this opinion.

Justice FLAHERTY, dissenting.

I respectfully dissent from the holding of the majority in this case. Before setting forth my reasons for doing so, however, I take this opportunity to express my approval of the Court's scholarly opinion with respect to the origin and philosophy underpinning the doctrine of adverse possession. In summary, I agree with the majority's observations about the efficacy of adverse possession in a modern world. The doctrine is a legal anachronism reminiscent of a time when landowners lived on or near their land and thus could observe encroachments on their property. Also, it is certainly worth noting that during the period when the adverse-possession doctrine developed, our society believed that it was in the public interest that land be used productively rather than being allowed to lie fallow. Neither of those situations is the case at present in our more mobile society. However, adverse possession remains the law in this state until the Legislature sees fit to change it.

### A

### The 1997 Letter

Simply put, I do not agree that the correspondence between plaintiff and defendant in which plaintiff offers to purchase defendant's interest in lot 19 is the smoking gun the majority perceives it to be. As is clear from a fair reading of plaintiff's testimony, she believed that she owned the property as a result of her longtime use of and dominion over it. But her testimony also demonstrates that she drew a crisp distinction between whatever ownership rights she may have acquired and record title, which she recognized continued to reside in the Morrows. In my opinion, the trial justice correctly found that the "fact that the plaintiff beginning in 1997 inquired as to the Morrow's willingness to consider a sale of the lot to her may certainly show that she was aware of the Morrow's record title. That alone, however, does not negate her claim of right." In *Tavares v. Beck*, 814 A.2d 346, 351 (R.I.2003), we held that the trial justice improperly factored a party's subjective knowledge into a claim-of-right analysis. In that case, we clarified that "a claim of right to own or use property does not arise from the claimants' mistaken belief that they hold title to the land, but rather from their objective acts of ownership evidencing an intent to use and possess the

premises in a manner adverse to the owner of record." *Id.* at 351–52. Further, we held that "[t]his remains true even in a situation in which the claimants know that they do not hold record title to the property in question * * *." *Id.* at 352. Such is the case here. Therefore, the 1997 letter was not a "silver bullet," but simply another piece of evidence that should have been, and properly was, considered by the trial justice.

Even if that letter were as significant as the majority contends, there is no doubt that it was sent after the statutory period had run. It is beyond dispute that plaintiff's correspondence could not serve to divest her of title if she had already acquired it by adverse possession. Rather, as this Court has discussed about the elements of exclusivity and claim of right, "in order for a defendant to successfully defend against an adverse possession claim of disputed land, 'there would have to be evidence indicating that the defendants or others had made improvements to the land or, at the very least, had used the land in a more significant fashion than merely walking across it.'" *Anthony v. Searle*, 681 A.2d 892, 898 (R.I.1996) (quoting *Gammons v. Caswell*, 447 A.2d 361, 368 (R.I. 1982)). There certainly was credible evidence for the trial justice to find that plaintiff had used the property as her own for well over twenty years before she corresponded with Mr. Morrow in 1997. Further, there was a stark absence of evidence that the Morrows "used the land in a more significant fashion than merely walking across it." *Id.* There is, in my opinion, ample support for this finding in the record, and the trial justice's finding is not clearly wrong.

## B

### The Factual Findings

Likewise, it is my view that there is sufficient evidence in the record that plaintiff's use of the property satisfied the statutory requirements of actual, open, notorious and hostile use for a period of at least ten years. As we have said in numerous cases, to establish the requisite hostility, the adverse possessor "need only establish a use 'inconsistent with the right of the owner without permission asked or given, * * * such as would entitle the owner to a cause of action against the intruder [for trespass].'" *Tavares*, 814 A.2d at 351 (quoting 16 *Powell on Real Property*, § 91.05[1] at 91–23 (2000)). Similarly, to satisfy the requirement of open and notorious use, a claimant must demonstrate that "the use to which the land is put must be similar to that which would ordinarily be made by owners of similarly situated real estate." *Id.* at 352 (citing *Sherman v. Goloskie*, 95 R.I. 457, 466, 188 A.2d 79, 84 (1963)). Furthermore, it is appropriate for the trial court to "tak[e] properly into account the geophysical nature of [the] land." *Carnevale v. Dupee*, 853 A.2d 1197, 1201 (R.I.2004) (quoting *Anthony*, 681 A.2d at 898).

The majority makes much of the fact that the plaintiff's use of the land was somewhat sporadic and seasonal in nature. However, this is consistent with how owners of a vacant lot adjoining a home in a beach area of the state would use this type of property. To this point our Court has said, "[y]ear-round occupation is not required to prove actual and continuous possession." *Lee v. Raymond*, 456 A.2d 1179, 1183 (R.I.1983). And, this Court also has held "that in determining whether there has been actual possession of property, there must be considered its character and locality, and the uses and purposes for which it is naturally adapted * * *." *Sherman*, 95 R.I. at 466, 188 A.2d at 84 (quoting *Goen v. Sansbury*, 219 Md. 289, 149 A.2d 17, 21–22 (1959)). There was

uncontradicted testimony that the plaintiff cut the grass, planted flowers, improved the flower beds, and entertained on the property. This is entirely compatible with the type of use that would be expected of the owner of unimproved land. Moreover, this Court repeatedly has made the statement that "[c]ultivating land, planting trees, and making other improvements in such a manner as is usual for comparable land have been successfully relied on as proof of the required possession." *Acampora v. Pearson,* 899 A.2d 459, 467 (R.I. 2006) (quoting *Anthony,* 681 A.2d at 898).

I realize that because he discounted the legal effect of the 1997 letter from the plaintiff to the defendant inquiring about a possible sale of the property, the trial justice referred to some improvements that were made after the letter was sent. But, even discounting that consideration, the trial justice found "overwhelming evidence" that the plaintiff had exercised dominion over lot 19 as an owner would for well in excess of ten years.[9] Viewing this case through the prism of our deferential standard of review, I am unable to conclude that the trial justice was clearly wrong when he found that the plaintiff's use of that land for a period exceeding two decades met the legal requirements to establish that she had acquired lot 19 by adverse possession. I therefore would affirm the judgment of the Superior Court.

**9.** It is true that the trial justice did not make use of the terms "strict proof" or "clear and convincing evidence" in his decision, but to me, evidence that is found to be "overwhelming" easily surpasses that criteria.