DECISION
Before this Court is a non-jury trial regarding a matter brought by Plaintiff, Joyce DiPippo (herein, "Plaintiff") against record owner of land, Louis and Rebecca Sperling (herein, "Defendants") to establish title by adverse possession pursuant to R.I. Gen. Laws, § 34-7-1. The parcel of real property is located within the Town of Warwick, Rhode Island.
 Facts and Travel
Based upon the testimonial evidence at trial and the documents admitted into evidence, this Court finds the following: This case arises from a dispute among abutters over the ownership of a piece of land in Warwick, Rhode Island. Plaintiff claims title to the disputed property. Plaintiff rests her claim upon adverse possession of the disputed property which is located at her rear property line and that of the Defendants, Louis and Rebecca Sperling. *Page 2 
 The Land in Dispute
Plaintiff purchased her lot (Plat 219, Lot 9) in 1972, and resided continuously at this location for thirty-nine years at the time of trial. The land at issue extends from the rear property line of Plaintiff's lot into the residential property of the Defendants. Plaintiff's lot is 85 feet wide and she avers that the area she claims to have adversely possessed extends 29 feet towards Defendants' residence, as measured from the surveyed lot between the parcels deeded to the parties. Directly following the property line between the parcels are the remains of a stonewall.
At the time Plaintiff purchased the lot, the abutting parcel behind the lot was vacant land. In 1990, a house was built on lot 172 by Rocco Sammartino, who eventually sold the property to Jean Kreykes. Defendants bought the property in 2002 from David and Kimberly Goldberg, who in turn had previously acquired it from Jean Kreykes.
 History of the Dispute
Plaintiff claims that she and her family used the disputed property for a prolonged period of time, beginning in 1972, long before Defendants' acquired their property (Plat 219, Lot 172) from the previous owner in 2002. Plaintiff's children played in the area, leaves were raked, and Plaintiff placed a hammock between two suitable trees to enjoy the shade during the hot summer months. The hammock, which soon became the favorite family hangout, is significant in this case. In 2004, when Defendants became aware of this invasion of their property, they contacted legal counsel, as well as their property insurance, for advice on how to deal with the intruders. *Page 3 
In the same year, they proceeded to send out a letter to their neighbors informing them of their plans to contest any adverse possession and their willingness to let others use their property after permission was obtained. Defendants filed a Notice of Intent to Dispute Adverse Possession in the city land records. In 2005, after having spent many summers quietly enjoying the breeze while swinging in the hammock, Plaintiff approached her new neighbors and inquired if they deemed it permissible for her to place the hammock in its traditional location on the now disputed property. Defendants saw no harm in being neighborly and gave the requested permission contingent on an indemnification agreement, which Plaintiff signed. In late 2005, one of the trees used for the hammock collapsed in a storm and leaned towards Plaintiff's property, threatening to damage structures on Plaintiff's land. Plaintiff repeatedly asked Defendants to remove the tree at Defendants' expense since it was located on Defendants' property. Hoping it would become a natural refugium for woodpeckers, Defendants refused to remove the tree trunk and advised Plaintiff to cut off only the branches that were encroaching onto her property. This was to be done at her own expense.
Much to Defendants' dismay, Plaintiff hired a third party to remove the entire tree. Defendants complained, protested vigorously and to drive the point home, they erected a stockade fence upon the disputed property. Plaintiff riposted by installing a spotlight that directed light towards Defendants' residence. Long gone were the days of peaceful swinging in the hammock; neighborly tranquility was foiled once again by a bitter neighborly dispute. And once again, it is upon a Court to adjudicate a matter which should have been settled by the parties themselves a long time ago. This Court is fully aware that whatever its decision, the bitter dispute is likely to continue and neighborly peace may not return. *Page 4 
 Use and Possession of the Land
Plaintiff claims that her use of the land included the building of a tree fort, the placement of inflatable swimming pools during the summer, and the hanging of a hammock for relaxation after exhausting yard work, some of which also occurred on the disputed property.
At trial, in addition to the Plaintiff, four witnesses testified: Alexander DiPippo, Harris Vederman, Kirsten Hart and Trudy DiPippo. Alexander DiPippo, Plaintiff's son, had by far the most specific recollection of the use of the disputed property. Much of his testimony was corroborated by his childhood friend, Harris Vederman.
Alexander DiPippo testified to playing in the disputed area as a child and stated that he had also engaged in the removal of leaves and the planting of grass in the disputed area. He testified that he and his father built a tree fort in the disputed area in 1977, which was later removed in the early 1980's. Alexander DiPippo further testified that he placed cedar steps on the disputed area to facilitate access to the area. He further stated that he was aware of a stonewall running along his neighbors' property line, and he testified that he didn't remember if there was a stonewall running along Plaintiff's property line. The Court finds that Alexander DiPippo was a credible witness.
Plaintiff testified about her use of the disputed parcel. This use included plantings and assuring that a portion of the area was cleared, either by a handyman or her son Alexander. She also used the disputed area for relaxation, including the use of the hammock that was hung between two trees, and recalls a tree house being on the disputed area. *Page 5 
Kirsten Hart also testified at trial. She testified that as a child she played with Alexander in the disputed area. This included playing in the tree house.
Trudy DePippo also testified at trial. She testified that she used a "turtle pool" and held puppet shows on the disputed area. Trudy DePippo recalls her brother, Alexander, raking leaves in the disputed area. Furthermore, she used the hammock with her friends.
Section 34-7-1 of the R.I. Gen. Laws, which addresses adverse possession claims such as the one brought by the Plaintiff, states as follows:
 "Where any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action."
In order to obtain title under adverse possession in Rhode Island, it is necessary to show actual, open, notorious, hostile, continuous, and exclusive use of property under a claim of right for at least a period of ten years. Corrigan v. Nanian,950 A.2d 1179 (R.I. 2008) (mem.); see also Sherman v.Goloskie, 188 A.2d 79, 83 (R.I. 1963); Norton vCourtemanche, 798 A.2d 925, 931 (R.I. 2002) (per curiam);Carnevale v. Dupee, 783 A.2d 404, 409 (R.I. 2001). *Page 6 
Furthermore, "[t]he party who asserts that adverse possession has occurred must establish the required elements by strict proof, that is, proof by clear and convincing evidence."Corrigan, 950 A.2d at 1179 (citing Tavares v. Beck,814 A.2d 346, 350 (R.I. 2003)).
The Court will discuss the elements of adverse possession.
 Actual and Continuous Possession
These two elements are present when the claimant can show that "the use to which the land has been put is similar to that which would ordinarily be made of like land by the owners thereof." See Anthony v. Searle,681 A.2d 892, 897 (R.I. 1996) (quoting Lee v. Raymond,456 A.2d 1179, 1183 (R.I. 1983)). Also, the continuity of the possession must be sufficient to alert the owner of the land that a claim of title contrary to his own is being asserted. SeeSherman v. Goloskie, 188 A.2d 79 at 83.
Here, over a time span of numerous years, Plaintiff placed objects on the disputed property and allowed children to play on it. Plaintiff's erstwhile husband erected a tree fort. Although structures such as tree forts are not known for their permanence, it is nevertheless feasible to believe that a suburban land owner might build a similar structure for her kids to play in, on property filled with underbrush and some trees. The same would apply to a "Mr. Turtle" pool and lawn chairs, familiar fixtures in most garages, including this Court's. Cedar slabs were laid on the ground to create a convenient pathway, which is more evidence of the continuous usage of the land. The Court finds that Plaintiff's use of the disputed property was actual and continuous. The exact dimensions of the property that Plaintiff exercised Actual and Continuous *Page 7 
Possession of will be addressed in this opinion, should this Court find that all of the elements of adverse possession have been satisfied.
 Open and Notorious Possession
Plaintiff's possession of the disputed property must also be open and notorious. See Tavares, 814 A.2d at 350. Plaintiff "must show that [her] use of the land was sufficiently open and notorious to put a reasonable property owner on notice of their hostile claim." Tavares, 814 A.2d at 353 (citingAnthony v. Searle, 681 A.2d 892, 897-98 (R.I. 1996)). No particular act on the part of the claimant is necessary to put the world on notice. Id. at 352. Here, the Plaintiff arranged for yard work to be done, including the cutting of vines and raking of leaves on the disputed property. She did this in order to keep the vegetation at bay and to allow room for recreational activities like playing in or about the aforementioned tree fort, puppet shows and kiddie pools. While these activities quite literally happened in the woods and therefore were not easily discernible to an observer's eye, this does not affect the open and notorious requirement of adverse possession. The true owner is still charged with knowing whatever is done openly upon his land. It is irrelevant whether Plaintiff's actions were clearly visible from the street and to the world itself. See id. at 354 (citing Sherman,95 R.I. at 466, 188 A.2d at 84) (quoting Marvel v. Barley MillRoad Homes, Inc., 104 A.2d 908, 911(Del. Ch 1954)). The Court finds that the actions of Plaintiff were open and notorious. *Page 8 
 Exclusive Possession
Plaintiff must have had exclusive possession of the disputed property during the ten-year period. See Tavares,814 A.2d at 350. In order for the possession to qualify as exclusive, "there would have to be evidence indicating that the defendants or others had made improvements to the land or, at the very least, had used the land in a more significant fashion than merely walking across it." Gammons v. Caswell,447 A.2d 361, 368 (R.I. 1982). Here, there is no record of anybody besides the family of the Plaintiff using the disputed land in any fashion relevant to the exclusive element. The Court finds that the Plaintiff was in exclusive possession of the land throughout the duration of the statutory period.
 Hostility and Claim of Right
Our Supreme Court has held in Tavares that "requir[ing] adverse possession under a claim of right is the same as requiring hostility, in that both terms simply indicate that the claimant is holding the property with an intent that is adverse to the interests of the true owner." Tavares, 814 A.2d at 351(quoting 16 Powell on RealProperty, § 91.05[1] at 91-28 (2000)). These two elements become the heart of the matter in this case. Defendants, who did not acquire their property until 2002, were not present as true owners when the statutory time limit for Plaintiff's adverse possession claim began to run in 1972. Therefore, Plaintiff began the adverse possession against a third party not present in this case, and if this Court decides that Plaintiff acted in a hostile manner and claimed right to the property, title in the disputed property has vested since the statutory period ran. *Page 9 
However, the Court is not convinced that Plaintiff satisfied these elements. In the recent Rhode Island Supreme Court case,Cahill v. Morrow, 11 A.3d 82 (R.I. 2011), the Supreme Court significantly changed the hostility and claim of right analysis to what the Court termed the more modern view. The Supreme Court stated "that an offer to purchase does not automatically invalidate a claim already vested by statute, but we nonetheless hold that the objective manifestations that another has superior title, made after the statutory period and not made to settle an ongoing dispute, are poignantly relevant to the ultimate determination of claim of right and hostile possession during the statutory period." InCahill, a neighbor brought a declaratory judgment action against the record owner claiming adverse possession of a twenty-foot strip of land. Before the statute of limitations on the adverse possession claim had run, the neighbor offered to purchase the property in question from the record owner. The Supreme Court held that this offer constituted an interruption of the neighbor's adverse possession claim. See Cahill, 11 A.3d at 90. In the instant case, the new analysis changes its outcome. Plaintiff never made an offer to purchase the disputed property. Instead, Plaintiff made several arrangements with the owners of the property neighboring hers that illustrated her acceptance of Defendants' superior title. Cahill directs the Courts in Rhode Island towards a more modern approach to issues concerning adverse possession claims. The Supreme Court did not overruleTavares and continues to hold that a claimant's mere knowledge concerning the record owner's superior property rights does not destroy the adverse possessor's claim of right. Seeid. at 91. Yet, the Court distinguished knowledge about the record owner's title from the objective manifestation of acknowledgement of another's superior title in the disputed property. See id. Such an acknowledgement became fatal to the adverse possession claim. *Page 10 
In the case at bar, this Court finds that there are declarations by Plaintiff of Defendants' superior title. When the Sperlings became the owners of the property, Plaintiff asked for permission to anchor the hammock on the disputed property. Defendants allowed her do so, conditioned on an indemnification agreement which Plaintiff was "happy" to sign. Here, Plaintiff acknowledged that someone else had superior title over the disputed property by asking for permission.
After the storm damaged one of the trees located on the disputed land which had previously been used to anchor the hammock, its tree trunk fell towards Plaintiff's property, branches and limbs extending towards her garage and threatening to damage it. Plaintiff became concerned about the potential damage and wrote a letter to Defendants asking them to remove the tree trunk. Plaintiff refused to pay for the removal, claiming that it was not her responsibility to do so since the tree trunk was not located on her property. However, she generously offered to contribute one hundred dollars towards the cost of the removal, even though she was under no obligation to do so. Here, Plaintiff refused responsibilities a property owner would ordinarily have to contend with because she was content to leave these burdens on the Defendants' shoulders. It should be noted that the Defendants do acknowledge the responsibilities coming with property ownership: they dutifully pay their yearly property taxes to the city of Warwick. Since its inception during feudal times, the concept of adverse possession has been difficult to digest. Yet, the question, "wolde you bothe eate your cake, and have your cake?" as coined by John Haywood in the sixteenth century, has been equally hard to swallow.
Concerning the testimony of Alexander DiPippo, this Court notes once again that his testimony regarding the use of the disputed property was credible. Mr. DiPippo stated that he *Page 11 
was convinced that the contested area belonged to his family, that he played on the disputed land and eventually started to take care of it by raking leaves and planting grass. Nevertheless, this Court will disregard this testimony to decide the case at bar. The Supreme Court has stated that while uncontradicted testimony must not arbitrarily disregard "such testimony `may be rejected if it contains inherent improbabilities or contradictions that alone or in connection with other circumstances tend to contradict it. Such testimony may also be disregarded on credibility grounds as long as the fact finder clearly but briefly states the reasons for rejecting the witness' testimony.'" Lombardo v. Atkinson-Kiewit,746 A.2d 679, 688 (R.I. 2000) (quoting Hughes v. Saco CastingCo., 443 A.2d 1264, 1266 (R.I. 1982)).
Here, the Court is especially concerned with the stonewall running along the southern boundary lines of all northern plats. Alexander DiPippo testified that he used to write on those rocks as a kid, but he also stated that he has no recollection of when he actually became aware of the existence of these stones. He testified that there was no such stonewall or any remains on the boundary line of the DiPippo property. Stonewalls are a familiar sight in the New England countryside. Traditionally, stonewalls have been much more than just fences to keep livestock from wandering onto a neighbor's property. One of their most important uses has been in serving as markers of boundary lines in New England. (See Susan Allport, Sermons in Stone: The Stone Walls of New England and New York, 47 (1994)). After all, it has been said for good reason that good fences make good neighbors. Alexander DiPippo was aware that there was a stonewall on the boundary line of the Harts' as well as the Fessendens' property. Even if there were no remains of that wall on the DiPippo property, this Court finds that common sense, an increasingly rare commodity, would forbid the conclusion that Alexander DiPippo drew. But not *Page 12 
only do the aforementioned plots of land share the same southern boundary line, they also share a common rectangular shape. Furthermore, fences built on the land between the DiPippos and their neighbors, the Harts and the Fessendens, do not cross over the southern boundary line, but instead stop right before it. This Court finds that Alexander DiPippo had reason to be aware of the existence of the southern boundary line, especially after he had left childhood and tree forts behind and grew into a sentient, responsible adult. Thus, this Court is not convinced that the testimony of this witness allowed for support of Plaintiff's claim in a clear and convincing manner.
This Court finds that the above arrangements show that Plaintiff was well aware that her interest in the disputed property was subservient to that of the Defendants. Furthermore, once again this Court deems it peculiar that all the lots neighboring Plaintiff's property and beyond have the same rectangular shape as Plaintiff's and the same stonewall marking their rear boundary line, yet Plaintiff claims that she, just like her son, always thought her property went beyond this clear border. While this peculiarity is not determinative, it nevertheless points towards Plaintiff's mindset. Our Supreme Court has said that "even when claimants know that they are nothing more than black-hearted trespassers, they can still adversely possess the property in question under a claim of right to do so if they use it openly, notoriously, and in a manner that is adverse to the true owner's rights for the requisite ten-year period." Tavares, 814 A.2d at 351. Yet, theCahill decision allows this Court to examine claims of adverse possession with even more scrutiny. Even though the statutory period of ten years for Plaintiff's adverse possession claim had arguably run well before there were any dealings between Plaintiff and Defendant, this Court will again emphasize the acknowledgements of Defendants' superior *Page 13 
title by Plaintiff, since they "are poignantly relevant to the ultimate determination of claim of right and hostile possession during the statutory period." Cahill, 11 A.3d at 93. Supported by the above reasoning, this Court does not find that Plaintiff met the necessary requirements for hostility and claim of right during the statutory period, especially when it is required that the evidence for the claim be clear and convincing. SeeTavares at 350. The evidence presented is far from clear, and this Court is not convinced.
 Conclusion
Based on the above findings, this Court renders the following decision: Plaintiff's claim for adverse possession is denied. *Page 1