DECISION
In this action, Plaintiffs Mark A. Plympton and Allison M. Plympton seek to redefine their border, which is adjacent to property owned by Valerie Morgan-Addison. This case was tried jury-waived.
 A. FINDINGS OF FACT
In the summer of 2006, Mark and Allison Plympton were searching for a new family home. They discovered a house for sale by Thomas Morgan at 115 Pleasant Street in the Wickford section of North Kingstown. Mr. Morgan owned this lot with the house, and a separate lot to the north was owned by his late brother's family. Mr. and Mrs. Plympton were each familiar with the neighborhood. Mr. Plympton was an educated individual and his experience with contracting gave him some familiarity with the town records. Generously assisted by town officials he examined title records, a Notice of Violation from the Coastal Resources Management Council (CRMC) relative to a seawall, a 1992 CRMC assent for reconstruction of a new seawall, and North Kingstown Historic District Commission records *Page 2 
denying an application for merger of the two Morgan lots to construct a new home. These records include a plan showing seventy feet of frontage for Thomas Morgan's lot (Exhibit 6).
After reviewing the records, Mr. Plympton became concerned with the boundary line between the two Morgan lots and the amount of street frontage for Mr. Morgan's house. Even though Mr. Morgan was represented by a realtor, Mr. Plympton visited Mr. Morgan's home on several occasions, expressing his concern for the size of the lot. Mr. Plympton now claims that Mr. Morgan described the boundaries to him[1], and eventually refused to discuss the situation further, suggesting that Mr. Plympton make an offer on the property through the realtor.
In October of 2006, Mr. Plympton offered to purchase Thomas Morgan's property.[2] A Purchase and Sales Agreement and a Disclosure Form were signed in November of 2006. Oddly, these forms make no representations concerning the location of the boundaries or the amount of frontage which Thomas Morgan's house lot had along the street, or on the water side, even though these issues remained of significant concern for Mr. Plympton.
Although the Purchase and Sales Agreement was not subject to a survey of the property, Mr. Plympton continued to press for an expanded boundary. Just weeks after the Purchase and Sales Agreement was signed, Mr. Plympton retained a local surveyor. Amy Sondler is a licensed surveyor and the owner of Easterbrooks Survey. After some preliminary work on the site, Ms. Sondler produced a survey of the property.
Having completed thousands of surveys in the past, Ms. Sondler indicated that her practice was to look at the deeds to ascertain "calls," that is, specific boundary markers and *Page 3 
distance references. Finding no such calls in the deeds, she did not search for plat maps, but instead went to the site. Ms. Sondler found no boundary markers, only items on the lot which had been used or installed by the Morgan families. Ms. Sondler then talked to neighbors, but not to the Morgans. Eventually, Ms. Sondler discovered an unrecorded 1905 survey which she received from a neighbor to the north of the undeveloped Morgan lot. She never determined who installed the plantings, the seawall, the tires, or the other markers.
Not producing a final survey, [3] Ms. Sondler then drafted a Boundary Line Agreement. In December 2006, a meeting was held on the lot with Ms. Sondler, the realtor who listed the property for Mr. Morgan, Thomas Morgan, Mr. Plympton and Mr. Morgan's niece, Valerie Morgan-Addison (an owner of the undeveloped Morgan lot to the north). Ms. Sondler walked the border described in the new agreement. The Morgans promptly expressed their reluctance to sign the document and indicated they wished to review it with their attorney. Although the Morgans never signed the document before or after the closing, Ms. Sondler contends that the proposed agreement accurately reflects the boundary "by occupation." The agreement indicated the street frontage for the lot being conveyed was 85.6 feet.
The closing was scheduled for December 2006 but did not go forward. The closing was delayed while the sellers resolved a separate title issue through a Superior Court action. Without further discussion between the parties relative to the location of the border between the two Morgan lots, or the size of the street frontage, a closing was held on October 29, 2007 — some ten months after the meeting at the site. Mr. Plympton executed the closing documents, paid the *Page 4 
purchase price, and began to occupy the house with the lot. No specific boundaries were agreed to. No right of first refusal was conveyed for the vacant lot.[4]
The day after the closing, Mr. and Mrs. Plympton filed the immediate suit against the Morgans, and recorded a lispendens against the undeveloped vacant lot, impairing the title of Ms. Morgan-Addison.
The two properties had been held independently by members of the Morgan family for decades. The land had been held by members of the Morgan family since the 1910s, if not before. Ms. Valerie Morgan-Addison was raised in the house at 115 Pleasant Street with her grandparents and lived there for about thirty years. Her uncle, Thomas Morgan, moved into the house in the 1960s. Family members used both lots interchangeably. Ms. Morgan-Addison's grandmother planted on both lots. After the grandparents passed away, Thomas Morgan owned the house lot (Assessor's lot 144) and Ms. Morgan-Addison's father, David Morgan, Jr., owned the vacant lot to the north. During the 1950s, while he owned the undeveloped lot, David Morgan, Jr. installed a seawall protecting both lots. A driveway was added to the vacant lot, though it was never paved. Different family members mowed both lawns at the same time. The boundary between the two lots was never discussed, nor was it ever an issue.
When Ms. Morgan-Addison took possession of the vacant lot, [5]
Thomas Morgan asked permission to park on her lot and plant trees on the northern side of her lot, and Ms. Morgan-Addison agreed. She also used the unpaved driveway and continued to use the vacant lot for some recreation, but now Ms. Morgan-Addison is unable to use the stairs to the water because gates have been installed by Mr. Plympton. *Page 5 
Before the closing, Mr. Morgan moved out of the Pleasant Street home. He lived in an apartment for a short period before suffering a stroke, soon after service of process of this suit. He was transferred to a nursing home and passed away in October of 2009.
Curt Douglas Andrews surveyed the property for a potential buyer of Ms. Morgan-Addison's vacant lot. Also an experienced surveyor, he acknowledged the same starting point: To find boundary references in the deeds. Like Ms. Sondler, Mr. Andrews was unable to find such references. Mr. Andrews had reviewed the title from the 1850s and discovered an 1802 recorded plat map. This Updike map (Exhibit A) was apparently prepared to plat lots in a separate section of Wickford Village. While the Updike map shows the lots on Pleasant Street, there are no measurements of distance, boundaries, or size of any of the Pleasant Street lots. Mr. Andrews meticulously measured the two inch lines and mathematically extrapolated dimensions for the properties. He then suggested that the intent was to create two separate quarter-acre lots and, therefore, Mr. Andrews split the street front distance evenly for the two lots to create his final computations of frontage distances for his survey.
Mr. Andrews viewed the site and observed that the two seawalls were adjacent to one another, and the beaches could be accessed by a set of stairs. He found it challenging to distinguish which member of the Morgan family was using each feature.
 B. PRESENTATION OF WITNESSES
The Court found Ms. Morgan-Addison to be highly credible and consistent throughout her testimony. She was well spoken and directly answered the questions posed to her. On cross-examination, she was clear and cooperative, though cautious and thoughtful. *Page 6 
Mr. Plympton appeared well-prepared and thoughtful on direct, but his credibility declined on cross-examination. Obviously knowledgeable about the intricacies of his case (having done extensive independent research before purchasing the property and filing suit immediately after), he avoided responding to the question of whether he accepted the deed at the closing. Mr. Plympton later claimed he didn't recall the CRMC cease and desist order or some of the particular surveys. He claimed that a recent discovery response concerning a 2006 survey was "not an intentional lie." Accordingly, the Court viewed him as a partial witness with limited credibility.
Although each of the surveyors seemed pleasant, qualified, and experienced, they each seemed to reach their conclusions promptly and refused any query into their respective methodologies. Ms. Sondler doubted her conclusion as she immediately encouraged a boundary agreement. At trial, she placed all of her conclusions on the uses and occupancies of the lot, though she never interviewed the Morgans to determine how the lot was occupied or how the items near the border were used or installed. Ms. Sondler admitted never talking to Ms. Morgan-Addison about the use or occupancy, but claimed she could "infer" that the occupancy of much of the vacant lot was with the house lot, basing her testimony on visual perception only. She never justified any problem with this rationale — hence, she ignored the clear evidence that the same family used both lots. Ms. Sondler avoided questions on cross-examination. Mr. Andrews seemed focused only upon the 1802 sketch which contained no express measurements. Mr. Andrews was unable to explain why his boundaries were not square, or why he refused to consider the use and occupancy. Each of the surveyors `split the difference' or deviated slightly from in hand data, to mesh their conclusions with the actual size of the lots. Their reluctance to *Page 7 
distinguish, accept, or even discuss their fellow professionals' rationale diminished the credibility of each surveyor and lessened the Court's confidence in their conclusions.
 C. ANALYSIS
In this case, the Court is called upon to determine the boundary line between two properties. For these lots, it is a most challenging task. The deeds do not provide measurements, clear descriptions, or monuments. The only recorded plat map is from 1802, appears to have been a mere sketch, and references no measurements, monuments, or clear descriptions. The Court is uncertain if the 1802 map was intended to plat these specific lots. In the same, the principals of use and occupancy do not provide a clear solution as the properties were used and occupied by the same family for approximately one century. During most of that time, the properties were used interchangeably and the common boundary was routinely ignored. Further, the two lots are extremely small. The total frontage of the two properties on the street is a mere 123.42 feet, and the depth of the properties (from the street to the water) is only 110 feet. It is easy to comprehend how one family could have co-occupied each of the lots with various cousins running back and forth across the border while relatives used and maintained the properties.
In addition, neither surveyor has described a definitive, accepted methodology for their profession in disputes of this type. Neither surveyor demonstrated which means of surveying is accepted within their profession when recorded information, actual use, and deed calls are not in accord with one another. The Court is left to speculate.[6]
With that backdrop, the Court reviews the cause of actions referenced. *Page 8 
 1. The Deed History
Mr. and Mrs. Plympton first suggest that the deed history establishes their ownership in the disputed area between the two lots. Our High Court has recently stated:
 The determination of what are the boundaries of land conveyed in a deed is a question of law. Co-operative Building Bank v. Hawkins, 30 R.I. 171, 187, 73 A. 617, 623 (1909). To glean the intention of the parties to a deed, this Court looks to the language in the deed in conjunction with the surrounding circumstances existing at the time of its execution. Gaddes v. Pawtucket Institution for Savings, 33 R.I. 177, 186-87, 80 A. 415, 418-19 (1911).
 Bitting v. Gray, 897 A.2d 25, 30-31 (R.I. 2006).[7] *Page 9 
Here, there is no clarity in the deeds. The deeds do not provide a metes and bounds description by measurement, by specific reference points, or by plat maps. The deed history does not persuade the Court that Mr. and Mrs. Plympton have ownership over the disputed area.
Ms. Sondler suggests that the unrecorded map or scattered personal possessions establish the property line. There is no evidence that the map or items were intended to establish the line or were accepted by the owners as the definitive markers.
The survey results suggested for Ms. Morgan-Addison by Mr. Andrews are also somewhat questionable. Mr. Andrews based his conclusions on the 1802 plat map. There was no preponderance of evidence that the 1802 map was intended to plat these particular lots, was ever used by the owners (or the Town) as a platting of these lots, or that the 1802 boundary was ever recognized. Indeed, it was challenging to even understand why the 1802 plat map showed these lots, given the lack of measurement, acreage, distance, or markers. Even the waterfront may have changed in the 209 ensuing years. None of the witnesses explained any deviation from the 1802 plat map.[8]
Accordingly, the deed history fails to establish that Mr. and Mrs. Plympton are entitled to more frontage on the street or greater acreage.
 2. Acquiescence
Mr. and Mrs. Plympton then suggest that they have established ownership of the disputed area by applying the law of acquiescence. *Page 10 
The Rhode Island Supreme Court has long recognized the doctrine of acquiescence in determining adverse possession rights and boundary line disputes. As our High Court recently held:
 This court first recognized the doctrine of acquiescence in O'Donnell v. Penney, 17 R.I. 164, 20 A. 305 (1890). At that time we joined a number of other jurisdictions in holding that even when there has been no express agreement, the adjoining landowners are "precluded from denying the boundary line recognized by both owners for a length of time equal to that prescribed by the statute of limitations barring a right of reentry." Locke 610 A.2d 552, 556 (R.I., 1992) (citing O'Donnell v. Penney, 17 R.I. 164, 20 A. 305 (1890)). "A party alleging acquiescence must show that a boundary marker existed and the parties recognized that boundary for a period equal to that prescribed in the statute of limitations to bar a reentry for ten years." Locke, 610 A.2d at 556.
 * * * Therefore, "the claimant must prove that the purported boundary line has been obvious to the allegedly acquiescing party." Powell on Real Property at 68-28. Generally, "the line must be marked in a manner that customarily marks a division of ownership," Id. at ¶ 68.05[5][b] at 68-28, and the marker must have been used for boundary purposes. Id. at ¶ 68.05[7][c] at 68-31. But, whether the boundary is sufficiently obvious to command notice is a question of fact. . . . Acampora v. Pearson, 899 A.2d 459, 464-465 (R.I. 2006).
In a more recent case, the Court followed its prior holdings on the doctrine of acquiescence stating
 [U]nder the doctrine of acquiescence, "when there has been no express agreement, the adjoining landowners are precluded from denying a boundary line recognized by both owners for a length of time equal to that prescribed by the statute of limitations barring a right of reentry." Nye v. Brousseau, 992 A.2d 102, 1008-1009 (R.I. 2010) (citing Acampora v. Pearson, 899 A.2d 464).
Here, Mr. and Mrs. Plympton have failed to show by a preponderance of the evidence that a boundary marker existed which any of the Morgans recognized as a boundary for ten *Page 11 
years. All of the prior owners used the lot interchangeably — using the beach, the seawall, the stairs, planting on one another's property, mowing each other's lawn, living in the house, and planting trees. The evidence did not establish that the Morgans recognized a border between the lots. The owners of the lots were not adverse, rather they are members of one vibrant, friendly family. None of the family members were shown to have considered any of the odd items placed on the lawn to be indicia of a boundary. Rather, Ms. Morgan-Addison's description of her life experiences — running as a child on both lots, her grandmother planting on both lots, and family members mowing both lots — leads the fact finder to conclude that there is no recognized boundary between the two lots. While adversity is not a necessary element, recognition of a common border is required and has not been demonstrated.
On occasion, one part of the Morgan family asked permission from the other to use the adjacent lot, but each such event consisted of Thomas Morgan requesting permission to use the undeveloped lot for planting or driveway use. While Mr. Morgan placed a hodgepodge of materials along one side of his property (which he may have done all over his property), nowhere has it been shown that the owners of the undeveloped lot acquiesced to this alleged border. Notice was not sufficiently obvious to command respect to a border or to even provide notice of an intended border.
Mr. and Mrs. Plympton failed to establish title to the disputed area by acquiescence.
 3. Adverse Possession
During the trial, Mr. and Mrs. Plympton suggested they were entitled to an interest in the Ms. Morgan-Addison's vacant lot pursuant to the adverse possession. A most recent Rhode *Page 12 
Island Supreme Court case, Cahill v. Morgan,2011 WL 175234, 5 (R.I. 2011) provides this Court with considerable guidance in applying the thorny elements of adverse possession to the case at bar. In Cahill, the High Court first reviewed the time-honored elements of adverse possession:
 In Rhode Island, obtaining title by adverse possession requires actual, open, notorious, hostile, continuous, and exclusive use of property under a claim of right for at least a period of ten years. Corrigan v. Nanian, 950 A.2d 1179, 1179 (R.I. 2008) (mem.); see also § 34-7-1. "The party who asserts that adverse possession has occurred must establish the required elements by strict proof, that is, proof by clear and convincing evidence." Corrigan, 950 A.2d at 1179 (citing Tavares v. Beck, 814 A.2d 346, 350 (R.I. 2003)); see also Carnevale v. Dupee, 853 A.2d 1197, 1199 (R.I. 2004). Cahill v. Morrow, 2011 WL 175234, 5 (R.I.) (R.I., 2011), footnote deleted.
In Cahill, a neighbor asserted adverse possession even though she asked to purchase the property during the statutory ten year period. This, our High Court held, was an acknowledgement of the neighbor's superior title. "This manifestation from Cahill interrupted the accrual of her claim." Cahill2011 WL 175234, 7. As the Court continued on page 10 of the decision:
 Rather, Cahill was openly and objectively manifesting direct evidence that George Morrow was the true owner of lot 19 and her interest in the property was subservient to his. This communication negates the requisite claim of right that the doctrine of adverse possession requires and interrupts the accrual of Cahill's claim. See Heggen, 144 N.W.2d at 242 ("[T]he recognition of the owner's title by an adverse claimant interrupts the adverse possession."); see also Bowen, 997 A.2d at 579 ("`Such an acknowledgment of the owner's title terminates the running of the statutory period, and any subsequent adverse use starts the clock anew.'"). Cahill v. Morrow, 2011 WL 175234, 9 (R.I. 2011). *Page 13 
In addition, Justice Indeglia, writing for the majority, reasoned that Ms. Cahill's plight was distinguishable from prior Rhode Island cases as "there was no preexisting, ongoing dispute between Cahill and Morrow when Cahill sent Morrow the letter [seeking to purchase the property]." In the case at bar, clearly there was no hostility among the Morgan family members prior to the purchase of the house lot by Mr. and Mrs. Plympton. Indeed, Mr. and Mrs. Plympton recognized Ms. Morgan-Addison's superior title. The Morgans used the properties as a friendly, generous family and no hostility was ever shown. Any claim of adverse possession or acquiescence is therefore defeated.
 4. Acceptance of the Deed
Oddly, Mr. and Mrs. Plympton appeared at the October, 2007 closing, tendered the significant purchase funds andthen challenged the extent of their ownership. Litigation, with a lis pendens, was filed the next day. When the Morgans failed to sign Ms. Sondler's survey agreement, Mr. and Mrs. Plympton knew that the border issue remained.
Over a year later, and while this litigation was pending, Mr. and Mrs. Plympton filed an application for a septic system with the Rhode Island Department of Environmental Management (Exhibit D). With this application, signed by Mr. Plympton, Ms. Sondler certifies that the sketches and plans are true and accurate, including the sketch attached. The attached sketch is quite different from Ms. Sondler's proposed survey agreement (Exhibit 8). While Ms. Sondler previously suggested that the Plymptons owned 70 feet of street frontage and Ms. Morgan-Addison only owned 63.43 feet of street frontage, the septic application sketch (Exhibit D) shows they each have 66.7 feet of frontage.[9] *Page 14 
The cumulative actions of Mr. Plympton and Ms. Sondler seem illogical and, simply put, unfair.
Our High Court has held
 Under Rhode Island law, once a warranty deed is accepted it "becomes the final statement of the agreement between the parties and nullifies all provisions of the purchase-and-sale agreement." Haronian v. Quattrocchi, 653 A.2d 729, 730 (R.I. 1995)(per curiam) (quoting Deschane v. Greene, 495 A.2d 227, 229 (R.I. 1985)).
 Nunes v. Meadowbrook Development Co., Inc. 824 A.2d 421, 424-425 (R.I. 2003)
Obviously, these facts do not justify reformation of the deed language or balancing the equities in favor of the plaintiffs. Rather, Mr. and Mrs. Plympton should be bound to what they received in the deed, "the final statement of the agreement between the parties." Id.
 5. Determination of Lot Lines
Mr. and Mrs. Plympton assert that they have superior title to the disputed area and seek an order determining their ownership of the land. (Second Amended Complaint, Counts 1 and 2). Ms. Morgan-Addison, in her counterclaim, requested an injunction removing any encroachment and an order determining the metes and bounds description of her real estate. (Counterclaim of September, 2010, Counts 2 and 3). The Court is empowered to declare rights and other legal relations pursuant to R.I.G.L. ch. 9-30.
As described above, the surveyors' testimony was not as helpful to the Court as hoped. In part, their limited testimony resulted from what little the surveyors had to work with: The deed descriptions were not precise; the deeds did not provide definitive boundaries or references to a plat map. As the properties were owned by the same families for almost a century, the *Page 15 
historical uses of the area do not reveal the intent to possess, to the exclusion of others. Given that one family owned the lots for so long, the uses were neither hostile nor notorious.
In considering a request for declaratory relief, our High Court has warned:
 Any petition which is based on facts and circumstances which may or may not arise at a future date is of necessity unripe and abstract. To warrant a grant of declaratory relief, there must be a real and substantial controversy admitting of specific relief through a conclusive decree or judgment rather than through merely an advisory opinion as to what the law would be upon a hypothetical state of facts. Also, there must be some present danger to a plaintiff's rights. The Uniform Declaratory Judgments Act requires that there be a justiciable controversy between a plaintiff and a defendant and does not authorize the Superior Court to give an advisory opinion upon hypothetical facts which are not in existence or may never come into being. Berberian v. Travisono, 114 R.I. 269, 273-274, 332 A.2d 121, 124 (R.I. 1975).
Here, there is a clear justiciable controversy: the determination of the present boundary line. Each of the parties seeks resolution of this controversy based on the evidence they presented at trial. The dispute affects their ownership and use of the disputed area of the property. A declaratory judgment is therefore appropriate.
Accordingly, the Court declares the lot lines to be as follows: Each of the lots shall have 66.7 feet of frontage on Pleasant Street. As there are two granite bounds on Pleasant Street, the boundary line shall run from the midpoint between the two granite bounds. The boundary shall then run easterly, to the westernmost point of the middle of the top step at the seawall, thence turning slightly southward and continuing easterly through the midpoint of the stake at the northeastern most corner of the concrete retaining wall (which said wall runs west to east, to the east of the stairs and near the shoreline) to the end of the properties in Narragansett Bay. Each of the properties, and their owners and invitees, shall have access to all the stairs, and from the stairs, to their respective beaches. *Page 16 
 6. Slander of Title
Ms. Addison-Morgan has raised a count for slander of title in her amended counterclaim. To establish such a claim, Ms. Addison-Morgan must show that Mr. or Mrs. Plympton maliciously uttered false statements about the ownership of the property which resulted in actual pecuniary loss. Hopkins v. Drowne, 21 R.I. 20 (1898). She must also show that a false statement was made with knowledge of its falsity and the specific purpose of injuring the other owner.Montecalvo v. Mandarelli, 682 A.2d 918, 923 (R.I. 1986). Not only was there no real showing of a pecuniary loss, but it has not been shown that Mr. Plympton made statements with the goal of injuring Ms. Addison-Morgan. Mr. Plympton appears to have had, at least at the time of filing, a reasonable cause of believing he had a right to the disputed property.
 7. Damages
Although Ms. Addison-Morgan was obviously harmed, she failed to show that she incurred compensatory damages. She was clearly prevented from using her own property, such as the stairs leading to the beach. However, she did not sufficiently establish compensatory damages for anything specific and she is being awarded a right to possess her property herein. By example, she never established that the sale of her own lot to Mr. Baginski failed, as a direct result of the lis pendens. The Court, therefore, grants her nominal damages of $100.
Ms. Addison-Morgan also requests punitive damages. To obtain such damages, she much establish that Mr. or Mrs. Plympton's behavior was so reckless or wanton that it "amounted to criminality."Palmisano v. Toth, 624 A.2d 314 (R.I. 1993). Ms. Addison-Morgan did not make such a showing here. *Page 17 
 D. CONCLUSION
On all counts of the complaint, judgment shall enter for the defendants, except that the Court grants the plaintiffs' request for a declaratory judgment to define the property lines, which the Court has done herein. On the Counterclaim, judgment shall enter for the plaintiffs on Counts 1, 4, 5 and 6. Judgment shall enter for Ms. Morgan-Addison on Counterclaim Counts 2 and 3. She is awarded damages of $100. Mr. and Mrs. Plympton are ordered to cease and desist from trespassing on Ms. Morgan-Addison's property as described herein. A declaratory judgment shall enter for Ms. Morgan-Addison establishing the boundaries as set forth herein. Ms. Morgan-Addison's requests for costs are preserved for her submission of a bill of costs.
Counsel for Ms. Morgan-Addison shall submit a judgment quashing the lis pendens and describing the boundary lines and suitable for recording.
[1] Mr. Morgan was deceased prior to trial and his testimony was not preserved for trial. Mr. Plympton now claims that Mr. Morgan referenced trees, shrubbery, tires, cinderblocks and planters to describe the boundary. As Mr. Morgan's property was disheveled and the subject of several CRMC violations, Mr. Plympton should have been suspect of any such representations, if made.
[2] Several offers were made and refused, including one that sought a right of first refusal on the neighboring vacant lot owned by the Morgan family.
[3] Ms. Sondler drafted a variety of preliminary plans showing different distances for street frontage.
[4] Thomas Morgan advertised his property with the potential right of first refusal. This right of first refusal was never assented to with the various owners of the undeveloped lot, Ms. Morgan-Addison's lot 145. The right of first refusal was not contained in the Purchase and Sales Agreement or Mr. Plympton's offer.
[5] Valerie Morgan-Addison became owner of record of Assessor's lot 145 in 2006.
[6] As with almost every case, the moving party bears the initial burden of proof. See McCormick on Evidence, 5th
ed., § 337, vol. 2, page 411.
[7] An older case declared:
 In construing the description contained in the deed, the purpose should be to find the intention of the parties. When this is clearly and definitely expressed in the instrument, that expression must control. If the description itself is ambiguous or uncertain in any particular, the intention of the parties in that particular may be sought from a consideration of all the calls of the description, of the state of the property, and of the circumstances in which the deed was made. This court, in an opinion written by Chief Justice Ames, said, in Deblois v. Earle, 7 R. I. 26: "The cardinal rule in the interpretation of all instruments, guaranties included, is `to read the writing' and, taking its language in connection with the relative position and general purpose of the parties, to gather from it, if you can, their intent in the questionable particular."
 * * * In considering the terms of the description in question, certain of the calls are definite, and must be held to indicate the intent of the parties, clearly expressed in the instrument. These positive calls should not be extended to conform to an intention which might be gathered from other parts of the description or from extrinsic evidence. "The chief purpose of construction is to develop the true intent of the language, and that intent should always be given paramount force when it has been discovered." Rosenberger v. Wabash Ry. Co., 96 Mo. App. 504, 70 S. W. 395. And "another principle is that description about which there is the least certainty must yield to those of greater certainty." Roberti v. Atwater, 43 Conn. 540. And as a general rule known and fixed monuments and boundaries will control courses and distances, and metes and bounds expressed with certainty will include the land within them. Nichols v. Turney, 15 Conn. 101. Co-operative Bldg. Bank v. Hawkins (R.I. 1909)
[8] The location of the waterfront in 1802 is highly relevant as Mr. Andrews concluded that each of the lots were originally to be a quarter of an acre.
[9] Even Mr. and Mrs. Plympton's southern lot line (the line which does not border with Ms. Morgan-Addison), differs from the earlier sketches.
 *Page 1